Miss Siegel. Good morning, your honors. Morning, counsel. My name is Gabrielle Siegel. I'm counsel of record for Alliance for the Great Lakes and I'm here presenting argument on behalf of all of the plaintiff intervenors in this case. May it please the court. The district court made two faulty rulings in this ruling was the district court's entry of an unreasonable consent decree between the plaintiff government and MWRD regarding allegations of violation of the Clean Water Act. The second flawed ruling was the district court's sui sponte dismissal of plaintiff intervenors Clean Water Act complaints. Both rulings stem from the ongoing violations of the Clean Water Act that have been occurring for decades as a result of MWRD's combined sewer overflows. After the rulings below, these discharges of raw, untreated sewage into our Chicago waterways and Lake Michigan in violation of Clean Water Act water quality standards will continue for decades more. You can remind me, and this is probably a very basic question, can you tell me again how you how your clients became a party to this litigation? Yes, Your Honor. We moved to intervene pursuant to the Clean Water Act which provides that any citizen may move to intervene as of right. We did that in a motion establishing standing by factual affidavits. The court considered motions from all parties. The court found that we had both standing, Article 3 standing, as well as a right under Rule 24A1 to intervene. No party today has appealed those rulings. So we are intervenors as of right and parties pursuant to this court's well-established law regarding the rights of intervenors. When you have a consent decree, the standard is pretty much universal. A consent decree cannot be entered unless it is substantively fair, adequate, consistent with the goals of the underlying statute here, the Clean Water Act, and in the public interest. This court has summed up those requirements as the consent decree being reasonable. In an environmental case, in ASCO Codings, the court notes that the most important aspect of reasonableness is the consent decree's effectiveness at cleansing the environment. In Donovan v. Robbins, this court... Counsel, isn't that one of the major problems here? The EPA believes that this agreement will be reasonably effective. You and your clients think that it won't be, but what will actually happen has to depend on the events. We've got competing predictions, roughly, about what will happen. Raising the question, why doesn't one wait and see whose project has been going on for 40 years and will be going on for at least another 16 if everything goes well. You've got the argument that if the next 15 years don't see improvements, then you construct treatment plants or treatment facilities at the remaining outfalls. That's an argument one can make, but whether it's sensible to do that depends on whether the plan is a success or not. Well, your honor, when these projects are constructed, of course they're done with engineering studies to try to predict. You don't just throw this incredible amount of money at a project like this and say, ah, it's not, who knows whether it's going to work. In fact, studies have been done here and have shown that based on all the best engineering that this fabulous sewage treatment authority can do, that in fact it will not work. Why, under the Clean Water Act, are we, all of us, going to be subjected to decades more when they know... Well, but there are competing studies that show it will work. Actually, there are competing studies, there are no competing studies that show that it will work. It depends on what you mean by work. What the EPA said, what the district court thought was reasonable, is a prediction that as completed according to this consent decree, the outfalls will be reduced from about one a year to one a decade. Not eliminated, but reduced to one a decade. Now, that's a prediction, and as I think Yogi Berra said, it's always hard to make predictions, especially about the future. How does one know whether that's going to happen until you see whether it happens? Well, first you look at the underlying studies. That study was looking at whether capacity would work. There have been studies showing that based on not just capacity, but how the system will work and how we see it working today. The fundamental issue about why we know it will not work and why we shouldn't...  The answer you're giving, the question I'm asking is, isn't the best way to know whether something will work to wait and see whether it works? And the style of your answer is, we're confident that it won't work, so there's no point in waiting. But that doesn't address the question. If you know it won't work, then there's no point in waiting, but the EPA thinks it will work. They aren't spacemen here. The EPA really thinks it will work. Your Honor, I think that to answer your question, there are studies here showing that it will not work and that, in fact, we can see it today because the fundamental aspect of this project are the tunnels. You can have holes in the ground as big as you want, but if the tunnels will not get the water to those holes, it doesn't really matter. The holes have been built. They've been completed since 2006. And the holes do not, based on the MWRD's own studies, show that those tunnels will not work. Because we know these facts now, we have been waiting on this project now for 46 years, and we'll be waiting even longer, and then we're going to say, oh, look, it really didn't work. We know now that it won't because the fundamental problem is the tunnels. The problem here may be just the definition of working. You haven't explained why you think there won't be any diminution in the frequency of untreated outfalls, now at one a year, roughly. There are a lot of passages in your brief that I understand as saying, even one untreated outfall in a century would be a violation of the Act, and therefore we have to do something else no matter how expensive. I'm wondering why you think that every untreated outfall is a violation if the EPA permits it. Well, Your Honor, we've never come up with that construct. The problem here is that the consent of the – Your brief unambiguously treats every untreated outfall as a violation of the Act. And I'm wondering why that is so. My question is if the EPA says it's permissible, which this consent decree does. Well, because the Clean Water Act and the permits and the water quality standards are what – is what MWRD has to comply with. So then why don't you argue that the consent decree is illegal because it violates the Act to permit any untreated outfall, with or without a permit of any kind? No, Your Honor, because what the problem here is that the outfalls – it's not any outfall, and we've never said that. It's the outfalls that are going to be happening under the construct of this consent decree. The outfalls as a result of transient events, which are huge storms that are so great that if you allow the water into the tunnel, it would destroy the tunnel. So we are not making that argument. It's what these tunnels can't do and that we know today that makes this consent decree unreasonable, and because of the water quality standards that will be violated. Let me try this from a different point of view. We know that – I share my colleague's understanding of your brief, yet there are other places where you say, no, no, of course we're not saying all overflows are illegal. Where I have trouble is understanding how we tell the difference and what levels are supposed to be acceptable under the permits in the Clean Water Act. That's clearly laid out in the permits. A violation of the dissolved oxygen standards when you have such massive stormwater discharges that you reduce the amount of oxygen. So even once? Certainly even once. Okay, because we also have – Even if the EPA expressly permits it. The EPA is not able to expressly permit a violation of the law, and I don't believe that – Congress seems to have, in essence, codified the 1994 CSO policy, correct? That's correct, Your Honor. And that policy allows some outfalls, right? Some overflows. If they do not violate water quality standards. Because even after the construction of the long-term control plan, if the – even in those circumstances, if the long-term control plan will not bring the sewage district into compliance with the Clean Water Act, they need to do more. And the CSO policy has never said that a district can violate water quality standards. What it does is it gives them time. And we think in this situation, when we know that there's a problem, and when all they're doing is being given more time to do something that they know will not work, and we're not talking about just one. What we're talking about is a consent decree that is set up that any time there is a massive storm, this district is allowed to discharge massive amounts of water. That's how the consent decree is set up. It's not in the performance criteria. And your solution is? Our solution is that there be a trial on the Clean Water Act violations, and that additional – Because it's a Clean Water Act violation when there's an untreated outfall. What's to try? No, there's a Clean Water Act violation when there is an untreated outfall that violates water quality standards. And that's when we win. But we do think that there's evidence in the record, and there will be evidence in the record, showing that water quality standards are violated. And in that case, just like in any other environmental litigation, an injunction would ensue. And the court evaluates what the appropriate remedies are, and they're imposed after a trial establishing what the appropriate remedies are. We are not saying don't do TARP. We think you should do TARP, and what we are saying is that it should be supplemented. And given the district court's entry of an unreasonable consent decree here, we think it's all the more egregious that the district court sui sponte dismissed Plaintiff Intervenors Clean Water Act complaints. Sui sponte dismissal of the complaints. Again, this is a fairly basic question. Where do you test your water quality standards? At outfalls, at the outfalls. Like, for example, after a CSO discharge, MWRD has records. How far from the lakeshore? It depends where the outfall is. Like, right along the Chicago River, there are locations, typically at pumping stations, where they will test what the chemicals are in the outfall. And that's how we know, based on past violations and past outfalls, that water quality standards have been met. That dissolved oxygen in water has dropped to zero. No oxygen in the water. No aquatic life can breathe in that type of environment. Another way to test it is with the standard dealing with floatables. First of all, virtually anybody can test that, the offensive conditions that occur after one of the discharges here. And so, even if, under the deference standards that this court has for consent decrees, the consent decree is entered, the sui sponte dismissal of plaintiff intervener's complaints clearly violates this court's clear instructions. Counsel, what, in your view, is the function in, I hate even to say it, 1365B1, capital B, what is the function in that statute of the reasonable diligence requirement? Of the? It says that a citizen suit can't be filed if the agency has filed an action that's pursuing it with reasonable diligence. Right. Right. In your view, does that have any function at all other than simply nominally deciding whether the citizen action is independent or part of the same suit? It sounds like you're saying that once an intervention has taken place after the public suit, the citizen group can pursue it just as if it were independent litigation. And then I wonder what function that language in the statute is serving. It doesn't seem to serve any function, does it? Yes. What the function of that language is about whether the administration, when it is commencing the suit and is diligently prosecuting that case, that is when the party is allowed to intervene. If, for instance, the government had commenced the suit and had- So surely you're not saying that if a suit is filed and not diligently pursued, then no one can intervene. No, Your Honor. That's topsy-turvy. Right. Look, I don't think you're getting my question. This statute is presumably doing something other than just providing that cases are consolidated. If there's a public suit not being diligently pursued, then an independent citizen suit can be filed. That's what this statute says. Yes, Your Honor. If it is being diligently pursued, then no independent suit can be filed. There can only be intervention. That's correct. But in your view, it sounds like those two amount to the very same thing, because in either case, the citizen group can pursue the litigation however it wants and cannot be knocked out by any public settlement. That's your argument. And if that's so, the diligent prosecution language seems to serve no function at all. That's why I'm pursuing this. Yes, Your Honor. The diligent prosecution language in capital B, that subparagraph, is there to prevent intervention after the case has been settled. It's while the case is ongoing, the citizens are allowed to intervene, and then just as this court's law has established, they'll prosecute the case. The case can go to trial or it may be settled, but all of the parties become full-fledged parties. There's no limit other than the law regarding intervention on what an intervening party can do. The diligent prosecution language here It looks like, then, it is serving no function at all other than deciding how many case numbers, how many docket numbers the district court has to issue. And that seems a very odd thing to say. It's not what the Supreme Court said in Gwaltney of Smithfield about this statute. But the Supreme Court in Gwaltney was addressing the issue of a separate citizen suit. Your suggestion of limiting the The Supreme Court doesn't grant certiorari to decide whether the district court should issue one docket number or two. I don't think the justices thought that that was the issue they were deciding, how many docket numbers there have to be. Your Honor, you're raising a very good point. When Congress established this provision of allowing intervention, it really was looking for having one lawsuit dealing with these issues. It's there in the legislative history. There was a lot of discussion about how are the courts going to be able to deal with all of these duplicate efforts. They wanted the citizens in the case, and they were relieving the burden on the courts by having one case. But they were not doing it in order to cut off citizens' rights. Ms. Siegel, if we were to affirm the dismissal here, is there anything that would prevent your groups from serving notice on a fresh round of citizen suits next month for ongoing Clean Water Act violations of this sort? The consent decree does not. We would be able to bring those claims. Of course, we'd be dealing with the fact that there is a consent decree that's been entered, and there would be the preclusive arguments, like in this court's ruling in Friends, that would be dealing with those issues. If you can prove, as you say, fresh violations with major storms and overflows that violate water quality standards, why couldn't you pursue those? We could, Your Honor. Okay. We could. Thank you. Thank you, counsel. Ms. Haslund. Good morning. May it please the Court, I'm here on behalf of the United States and the State of Illinois. I wanted to correct one misstatement earlier, is that the test for water, there was a question about where water quality standards are tested. They are tested in stream, not at the outfall. I'm having some trouble understanding you. You're mumbled. Please be louder. Oh, I'm sorry. Don't move the microphone. Okay. Just speak louder. Okay. Excuse me. I wanted to clarify one point that one of the judges asked, where the water quality standards are tested. They are tested in stream, so in the water. Off the lake shore, but in stream? Well, it could be off the lake shore. What in stream means is in the water body, not at the discharge point. So I just wanted to clarify that. That didn't clarify it for me. I'm sorry. In stream means in the water body, whether it's the canal, the Calumet River, Lake Michigan, all of the water, whatever. In the water. In the water, right. One problem with cases where the lawyers are experts is they think we know the same vocabulary. One of the things you need to do is translate for generalists. I will do my best. Thank you. The water quality we're talking about, therefore, is the water quality in Lake Michigan as a whole, or the water quality off the lake shore near Chicago? It depends on the permit. So the water, well, I'm sorry, that's wrong. The water quality standards are set for different water bodies in different parts of the water bodies. In Lake Michigan, there would be different water quality standards depending on where you are in the lake. As with the rivers and the canals, there are different water quality standards in the different. So within, say, three miles or so of the lake shore off Chicago would be different than they would be in the center of the lake? Possibly. I don't happen to know. Lake Michigan? I don't know. I'm familiar with Lake Michigan. I am not familiar with the water quality standards throughout Lake Michigan. All right. I wanted to address a point that raised by opposing council here, that this doesn't clean up the combined sewer outfalls immediately. There is nothing that could do that. And I just wanted to point out that she's saying that we have to wait and see and that the reservoir might not work at all. She's saying we have to wait and see at least another 15 years, and that really is incorrect. No, the interveners don't want to wait. It was my question why one doesn't wait to see whether the program of the decree can be carried out. If you're opposed to waiting, you should be on the intervener's side. No, I'm not opposed. We aren't. I'm sorry, Your Honor. I'm not opposed to waiting. What I was trying to clarify here is that by the end of this year, the Thornton Reservoir will be online. By the end of 2017. Excuse me. Is predicted to be operational. Predictions by governmental bodies, even private bodies, don't always come true. They don't always come true. That's right. But there are penalties in the consent decree for them failing to meet the deadlines, and the deadline is the end of this year. The deadline for completion of Stage 1 of McCook is the end of 2017. So within the notion that these reservoirs are just going to sit empty because the tunnels don't get the combined sewer overflow to the reservoirs, we will have very good information about that within three years. We already have very good information about the success of the system that has been completed, and it's capturing 98% of the combined sewer flow. The Calumet Tunnels themselves, which is the second system that will be completed, is capturing 85%, even without the reservoir. So within the next three years, the 2.6 billion gallons that are captured now will be more than quadrupled. So the notion that we should come up with some kind of new plan, stop what we're doing or keep doing what we're doing, and then require a whole new approach to this at this juncture, I think the district court certainly did not abuse its discretion in finding it is reasonable to continue on the path we're on, to set deadlines, to impose penalties for missing those deadlines, and to require very careful monitoring of the results of this progress. When pressed at the hearing, the district court was not able to understand from the interveners what alternative they were suggesting, and that's in the joint appendix at 336 to 343. They have still provided no clear answer as to what they think should be done. They offered several options. One was building treatment facilities at every outfall. That's expensive. The estimate, the district court quoted, was $1 billion. But that's a real proposal. One can evaluate that. Well, that was one. They didn't say this is the option we think you should take. They said you should do something else. I mean, they suggested a relief. Sure, they're not the experts. An additional relief tunnel, which would be another massive undertaking for the mainstream tunnel system. Is that some kind of pun? Undertaking? I guess it is, yeah. Right. You're right, Your Honor. They're not the experts. The experts that have addressed this issue believe that it will work. The results from the system as constructed show that it should work. The systems that are constructed do work. Ms. Hazard, could I follow up on one point? I believe it was your brief. As you know, the interveners are relying heavily on a 1994 study of the tunnel and reservoir program, and you all were arguing that the design has changed since that study was done. Has it changed in any material way? And if so, what is it? It's changed in that the reservoir design is different from the design considered in the 1994 study. There also was a change in the interim. In ways that are relevant to these flow problems or the geysering problems that we've read about? It's actually, Your Honor, I'm sorry, very hard to understand what exactly the 94 study shows. We found it somewhat internally inconsistent. There were places in the 94 study where it said addition of the reservoirs will not make any difference, and then there were instances where it contemplated that the reservoirs would be 93% full. So we find it difficult to draw conclusions from that, and I think interveners rest their argument that the system will not work on that one study. Right. And it sounds like you're attacking that reliance in a couple of different ways. One is to say the study is internally inconsistent and ambiguous. Another is to say it's irrelevant because we've changed the design since then. But I'm trying to understand, or at least if you can point me, where I need to go to find out how it has changed and why that should make a difference. I don't think I can point you to anywhere on that, Your Honor. I'm sorry. On the question of the dismissal of the citizen complaints and intervention, I hope you'll address that as well. Can I just add one more thing on the 94 study? Sure. One of the other things in rereading the 94 study is that one of the things the 94 study says is that optimizing the inflow, that is the inflow to the tunnels, to maximize stormwater capturing will go very far to improving the efficiency of the TARP system. That's at SA34. So that is consistent with what the district has been working on and what EPA and the district have been working on, which is that if you just have all of the sluice gates open completely and let the water flow in when you have a huge storm all at once, you're going to have geysering and problems. But if you operate them in such a way to sort of moderate the flow in, you're going to have much greater success in the tunnels capturing the stormwater. Another thing is that the study was based on one design storm, and this study itself says that it does not apply to smaller storms. So what interveners are doing is extrapolating from sort of one design storm in a study that's old and hard to understand to say that the system isn't going to work and they're not taking account of the success that has been achieved with the existing system. Sorry, I didn't want to disregard the second point. It raises something in my mind. This isn't just a pipe that goes into a reservoir and this is all done without human intervention. There are controls that you can increase the flows, decrease the flow, and so forth. Exactly. And that's what the operating plans are designed to do, is to say when you have flow at this point. Of course, storms are all different, right? You might get a lot of water in one place and not much water in another place. And so the design, the operating plan is to try to address different flows, different volumes at different times, how you're going to keep there from being geysering and bottlenecks and other problems. So I wanted to go to the second issue, is that we agree that interveners are interveners as of right and that they, therefore, are parties to this suit and that we take the next step that they, therefore, are bound by the judgment. But there isn't any judgment to which they have consented. Parties are bound by the district court's final judgment. They aren't bound by an agreement of two parties. That's right. Indeed, that's the problem with your position. The problem with the intervener's position is that it seems to make absolutely nothing of the statutory language about reasonable diligence. It deprives it of any meaning. The problem with your position is that it seems to deprive the right of Because the case will proceed, on your view, just exactly as would have happened had the interveners instead been participating as amicus curiae. I don't see it that way. Articulate for me the difference on the EPA's view between intervention and participating as amicus curiae. Okay. As interveners, they brought claims here that nobody else did, okay? Not Clean Water Act claims, but the original parties to this suit, we brought the same Clean Water Act claims they brought. We settled. They disputed the reasonableness of the settlement. There is nobody else doing that. Amicus couldn't do that. Counsel, I wish you would address my question. I want you to articulate the difference between intervention and participation as amicus curiae. Well, for one thing, as interveners, they could appeal, as they did here. As amicus, they could not. Any other difference? As amicus, I don't know what they would have done as amicus to contest the consent decree. They would have told the district judge that he shouldn't enter it. Yeah, well, I mean, I guess that's the same as the difference whether there's a consent decree or not between an intervener and an amicus. I don't see why it's different that there is a consent decree entered as a judgment versus, say, summary judgment. In either case, an intervener has very different options than an amicus. Another way of asking about this, in essence, is to what extent are the interveners bound by the terms of the consent decree? And I don't understand how they are at all since they didn't consent. Do you agree with that? I agree with that. So they can give you notice next week of ongoing violations. They want to bring a new citizen suit. You say, we're out, we're satisfied with the consent decree, and they can then proceed, correct? Yes. Okay. Yeah. I mean, frankly, actually, the consent decree doesn't bind EPA or the state either from bringing claims for future violations. I mean, I don't want to suggest that it has no effect. It does have an effect in the same way that the Milwaukee Rivers case had an effect on claims that they have pending in another suit. That I don't understand, but okay. Okay. I don't want to complicate the issue unnecessarily. I understand the consent decree does bind the district, U.S. EPA, and Illinois EPA in some respects. Right. That's the whole point. But if it doesn't bind the interveners and they're free to pursue, I'm not sure what good the dismissal of the claims and intervention does other than just cause them to file a separate lawsuit. Well, the way we view it is that their challenge to the consent decree and their challenge to the consent decree, they were obligated to make all the arguments and we thought they did make all the arguments they had as to what relief they thought was appropriate for the same violations for which we entered the consent decree. So those claims have been litigated, adjudicated. I'm talking about ongoing violations. But for any ongoing violations, any what I would call new violations, ones that post-date, the ones covered by the consent decree, there's nothing that bars them from pursuing those claims. Okay. Did you have a question? Would they be bound by standards that you arrived at in the consent decree? Well, they would be asking for relief of whatever nature. And in evaluating the relief they're seeking, presumably the court would consider the relief that has already been determined to be reasonable. But there's nothing prohibitive. They wouldn't be bound by it, but they could challenge it. Exactly. Okay. I'm going to sit down and allow my colleague. Certainly, Ms. Hazard. Mr. Wilson. Good morning. May it please the Court. I'm Benjamin Wilson. I'm with the law firm of Beverage and Diamond. We represent the Metropolitan Water Reclamation District of Greater Chicago. I really have three points that I wanted to raise. But if the Court will allow, I believe Judge Easterbrook asked about the difference between a MECI and the participation of the appellants in this case. Obviously, MECI don't get to take discovery. They don't get to take depositions, propound interrogatory, submit requests for admission. Actually, sometimes they do. And that's what happens. There's this curious category of people who are called litigating a MECI. Right. And they do take discovery. But I would submit that's generally the exception and not the norm. That's the exception. Respectfully. And I would also like to make several points. Obviously, the standard here is abuse of discretion. I don't hear any argument there. Clearly, the standard below was whether or not this decision was reasonable. We believe it was reasonable. And we believe Judge Marovitch, in his 32-page opinion, took painstaking efforts to explain why it was reasonable. I've heard the reference to the fact that it's taken 46 years thus far. And that's fair. In fact, it's accurate. But the fact of the matter is that districts started approved TARP weeks after the Clean Water Act was enacted. So we were ahead of Congress. And after 19 years, we'd spent $1.8 billion on this project when EPA got around to deciding it wanted a policy. When we started this project, it was to be flood control and pollution control. And our friends in Washington were going to fund that. And then later, EPA said, you don't need the reservoirs. Now, they're glad that we have them. Fortunately, the district was determined to have the reservoirs as part of this project. People would have you believe that the citizens of Chicagoland are not getting any help right now, that nothing could be further from the truth. The first part of this. We're not here to re-argue the wisdom of the water district's policies. There are legal issues that need attention. Fair enough. But what I was trying to address, though, was a legal question that was raised that I believe by the appellants, their view that this will not work. And somehow, therefore, the decision below should not be upheld. And what I would submit to this court. Well, let me ask you a question that continues the discussion that my colleague, Judge Hamilton, had with Ms. Hazard. Do you agree that after giving a new 60-day notice, the interveners can file a brand-new lawsuit about this very issue? Absolutely not. So you and the EPA disagree about this? Apparently so. Tell me why. Well, the reason I will give you the basis for my opinion and the basis for our opinion is they came in. This was a citizen suit. And as the court noted earlier in the discussion, the whole point of citizen suits was to have private attorneys general when the government would not act. The attorney's fees provisions for these citizen suits under Clean Water Act, Clean Air Act, they're stolen from the civil rights statutes. I come from a part of the country where the civil rights laws are, of course.  Borrowed. Not stolen. Borrowed. Sampled. But the point is that's what they did. And the point was if the federal government or the state government won't act, then private citizens need to act. Here, EPA did act. There was a four-and-a-half-year negotiation. Here, there are. What does the consent decree have to do with that? You're not arguing, I take it, that a private suit is banned if the EPA and the water district carefully negotiate a new permit and agree on what will happen out of court. Why should it be different if they agree in court? Forgive me, Your Honor. I didn't mean to step on your question. The fact of the matter, though, is that Judge Marovitch has ordered that the federal government has acted with due diligence and, therefore. . . Please address my question. I'll tell you how I am. Which is you agree that a private suit is permissible if the water district and the EPA negotiate a permit out of court, and the interveners believe the permit is illegal. Why should it be different if those negotiations take place and form the basis of a consent decree? In either event, the private parties haven't had their claims heard. And I submit to you that's not the case here, Your Honor. I submit. . . I'm not asking about this case. Oh, I'm sorry. I'm asking in general, as a matter of law, when a separate suit is allowed. And I would say yes, as long as this separate suit was not a citizen suit, which is brought when the federal government is not otherwise acting. What has happened here. . . Thank you, counsel. Your time has expired. Thank you, Your Honor. Anything further, Ms. Siegel? Yes, Your Honor. Forgive me for my delay in processing your question. What is the purpose of the diligent prosecution language in subparagraph capital B? The purpose of that language is to preclude separately filed citizen suits. That's what the purpose of that statute is. If this case, which is brought, is diligently prosecuted according to the law of diligent prosecution, it would preclude a prior filed lawsuit within the 60-day period that allows a preclusion. That's the purpose of it. All right. But you don't think it precludes a subsequent lawsuit. What is your view on the disagreement between the EPA and the Water District? Oh, well, I certainly agree with EPA. As a matter of fact, the very excellent questions that Your Honors are asking about this evidence is exactly what a trial would do. That's exactly if we had had the chance to bring in experts. You get the point, which is, at that point, who cares? If the district court's dismissal of your suit stands and you're not bound by the consent decree, all you have to do is give another 60-day notice and off we go again. Why are we fighting this? Well, Your Honor, I don't think that the party should be fighting the reversal of the dismissal because we have filed claims for continuing violations. But the point here is there is a- But I don't understand why you're fighting. I don't understand why the EPA is fighting if it says, well, wait 60 days and do it again. I understand why the Water District is fighting if it says you can't file a separate suit. But if you and the EPA agree, you know, the 60 days have long passed. You didn't have to wait for this appeal. Well, Your Honor, Your Honor, in this case, we have a right to proceed with our complaints because we're legitimate parties. And we were sua sponte, dismissed, without being able to even say hello to the court, much less demonstrate why we go forward. So we have complaints that are legitimate complaints that allege not only the past violations, which have been addressed, but continuing violations since the date that the consent decree has been lodged. And just because we could also file another case does not mean that this case that was legitimately filed, that the MWRD answered our complaint, why should we not be able to go forward in the regular course, where we would bring in experts, evidence to address those issues, where the fact that the government is saying that we know how to control the flow, what they don't tell you is controlling the flow means if it doesn't go in the tunnels, it goes into the river untreated. That's what controlling the flow means. And that their current operating standards are if it's a big storm, turn off tarp. We can't have it explode.  And those are the allegations that we made in this case were legitimate parties. And absent some reason why we can't go forward, which has not been articulated here, we have a right to pursue those claims. Counsel, this is just a procedural question. Did Judge Marovitch grant you standing? Was he the judge that granted you standing? Yes, Your Honor. Yes, Your Honor, he did. And that was a prelude to his intervention. If the government is so certain that this consent decree is going to work, why are there not performance standards in this consent decree that says how many CSOs there can be in any normal year, like the consent decree in Akron, where the court brought in a special master and evidence.  In a world in which in the last hundred years we've had something like 1,200-year floods in the Mississippi River, defining normal seems to be very difficult for governmental agencies. Defining normal for any of us, Your Honor, is very difficult. However, there are scientific terms that are adopted and used in this industry that describe exactly that. And so we don't leave it to normal discourse to define a normal year. Like global warming? Well, those are exactly the issues that need to be addressed, is that we have since the lodging of the consent decree. The consent decree could be amended to provide that on no single day will more than 10 inches of rain fall in Chicago. Well, that would be nice. And if it could be a consent decree about Boston snow, that would be great, too. I'm sure everybody would appreciate that. But there are ways to deal with this. Other communities across the country have standards that are in their consent decree and have additional supplemental efforts that could be taken. Ms. Siegel? Yes, Your Honor. You have relied upon a number of district court decisions that, in essence, you view as tougher on the issue of CSOs. Sorry. But can you direct us to any cases in which circuit courts have rejected approvals of similar consent decrees? Circuit courts have. That have done exactly what you are asking us to do? I'm thinking the Telluride decision has not. I mean, if the decision, what happens, Your Honor, is if the consent decree has been rejected, what typically happens is that the party goes back, like in the Akron case, the parties went back and redesigned it. I'm talking about rejected by the circuit court. And I know of none, Your Honor. Thank you. Do I know of any? No. I know of none, Your Honor. Thank you very much, Ms. Siegel. Thank you, Your Honor. Case is taken under advisement.